ELLIOTT N. KANTER CSB 95054
LAW OFFICES OF ELLIOTT N. KANTER
2445 5TH AVENUE, SUITE 350
SAN DIEGO, CA 92101
TELEPHONE 619-231-1883
FACSIMILE 619-234-4553

ATTORNEY FOR PLAINTIFFS, HECTOR MARTINEZ, MICHAEL GARROD, GEORGE SILVA and MYRNA SILVA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR MARTINEZ, GEORGE SILVA, MICHAEL GARROD, AND MYRNA SILVA<br><br>Plaintiffs,<br><br>vs.<br><br>SWEETWATER AUTHORITY and DOES 1 THROUGH 50, INCLUSIVE,<br><br>Defendant(s). | ) Case No: 3:13-cv-00167-CAB-NLS<br>) **PLAINTIFF'S OPPOSITION TO**<br>) **DEFENDANT'S MOTION TO DISMISS**<br>) **PLAINTIFF'S FIRST AMENDED**<br>) **COMPLAINT PURSUANT F.R.C.P. 12(b)(6)**<br>)<br>) **Date:** June 28, 2013<br>) **Time:** 2:00 p.m.<br>) **Court Room:** 4C<br>) **Judge:** Hon. Cathy Ann Bencivengo<br>)<br>)<br>)<br>) |

# TABLE OF CONTENTS

Table of Authorities.................................................................................................3

**Introduction**...........................................................................................................5

**Argument**...............................................................................................................5

    **I.**    **Plaintiff's First and Fourth Causes of Action**
           **State Facts Sufficient To Support A Cognizable**
           **Claim For Retaliation**.................................................................5

          **A.**    The Ninth Circuit Does Not Require A Plaintiff to Obtain
                An EEOC Right-to-Sue Notice if the Plaintiff has Obtained a
                a Right-to-Sue Notice From the Appropriate State Agency.................5

          **B.**    Plaintiff's Failure to Obtain an EEOC Right-to-Sue
                Notices is No Bar to A Title VII Claim When the
                Underlying Claim is For Retaliation..............................................8

          **C.**    In the Alternative, If the Court Finds that Plaintiffs'
                Failed to Exhaust Their Administrative Remedies Before
                Filing the First and Fourth Causes of Action, Said
                Causes of Action Should Be Dismissed Without Prejudice.................9

    **II.**   **Plaintiff's Second and Third Causes of**
           **Action Are Neither Deficient, Nor Time-Barred**...................................10

          **A.**    Plaintiff's Third Cause of Action is Not Time-Barred
                 Because The Facts Alleged in the First Amended
                 Complaint Clearly Indicate That Defendant's
                 Racial Discrimination Is Continuing To This Day.........................10

          **B.**    Plaintiff's Second Cause of Action For Failure to Prevent
                 Discrimination and Retaliation is Timely And Plead
                 With Sufficient Facts as To Constitute A Claim Upon
                 Which Relief May Be Granted...................................................12

    **III.**  **Conclusion**

# TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1117 (11th Cir. 2001).....................13

*Berry v. Essilor of America, Inc.,* 123 F. Supp. 2d 1342, 1348 (M.D. Fla. 2000).............13,14

*Burke v. Cornerstone.* No. 07–889, 2007 WL 3046193,
1–2, 2007 U.S. Dist. LEXIS 76662, (D.Conn. Oct. 12, 2007)..................7

*Celotex Corp v. Catrett,* 477 U.S. 317 (1986)..............................................13,14

*Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir.1999)...............13

*Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000)...............13

*Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 (11th Cir. 1998)............13

*Harris v. Forklift Sys.,* 510 U.S. 17, 22 (U.S. 1993).......................13

*Hause v. Salvation Army,* unreported in F.Supp.2d (Westlaw citation 2007 WL 4219450)...............8

*Isaac v. Harvard Univ.,* 769 F.2d 817, 822 (1st Cir.1985)........................9

*Jones v. Grinnell Corp.* (5th Cir. 2001) 235 F3d 972...........................5,7

*Karim–Panahi v. Los Angeles Police Dep't,* 839 F.2d 621(9th Cir.1988)...............6

*Laquaglia v. Rio Hotel & Casino, Inc.,* 186 F.3d 1172 (9th Cir.1999).................8

*Lebrón-Ríos v. United States Marshal Serv.* (1st Cir. 2003) 341 F3d 7...............9

*Lipsett v. Univ. of P.R.,* 864 F.2d 881, 898 & n.18 (1st Cir. 1988).................13

*Little v. United Techns.,* 103 F.3d 956, 959 (11th Cir.1997)...................13

*Love v. Pullman Co.,* 404 U.S. 522 , 92 S.Ct. 616, 30 L.Ed.2d 679 (1972)...............9

*Noviello v. City of Boston,* 398 F.3d 76, 94 (1st Cir. 2005)....................13

*Pietras v. Bd. of Fire Comm'rs,* 180 F.3d 468 (2d Cir.1999).....................7

*Place v. Abbott Laboratories* (7th Cir. 2000) 215 F3d 803.....................9

*Richards v. CH2M Hill, Inc.* 26 Cal.4th 798 (2001)......................10,11

*Rivera-Rodriguez v. Frito Lay Snacks Caribbean,* 265 F.3d 15, 24 (1st Cir. 2001)...............13, 14

*Stiefel v. Bechtel Corp.* (9th Cir. 2010) 624 F3d 1240......................5

*Surrell v. California Water Service Co.,* 518 F3d at 1097.....................5,6,7,8

*Temengil v. Trust Territory of Pacific Islands,* 881 F.2d 647(9th Cir.1989)...............6

*Trujillo v. North County Transit Dist.*(1998) 63 Cal. App. 4th. 280.................12

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)..........................6

STATUTES

*Federal Rule of Civil Procedure* 12(b)(6)..............................................................5,10

29 *Code of Federal Regulations* § 1601.13(b)(2)(ii) .............................................8

42 *United States Constitution* § 2000e-5(e)(1)......................................................8

EXHIBITS

| | |
|---|---|
| *Exhibit A*: | A true and correct copy of Plaintiff Hector Martinez's DFEH Notice of Right-to-Sue |
| *Exhibit B*: | A true and correct copy of Plaintiff George Silva's DFEH Notice of Right-to-Sue |
| *Exhibit C*: | A true and correct copy of Plaintiff Michael Garrod's DFEH Notice of Right-to-Sue |
| *Exhibit D*: | A true and correct copy of Plaintiff Myrna Silva's DFEH Notice of Right-to-Sue |
| *Exhibit E*: | An e-mail sent by Hector Martinez to his boss Jim Smyth on May5, with an attachment of a selection of literature called "*Defining Racism – Can We Talk?*" by Beverly Tatum, a former University of California – Santa Barbara Professor and the current President of Spelman College |

**INTRODUCTION**

Plaintiffs Hector Martinez, George Silva, Michael Garrod and Myrna Silva hereby submit the following Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

**ARGUMENT**

I.

PLAINTIFF'S FIRST AND FOURTH CAUSES OF ACTION STATE FACTS SUFFICIENT TO SUPPORT A COGNIZABLE CLAIM FOR RETALIATION

**A.    The Ninth Circuit Does Not Require A Plaintiff to Obtain an EEOC Right-to-Sue Notice if the Plaintiff has obtained a Right-to-Sue Notice From the Appropriate State Agency.**

Defendant argues that Plaintiff's failed to exhaust their administrative remedies by failing to obtain right-to-sue letters from the United States Equal Employment Opportunity Commission (EEOC). It is important to note, however, that Plaintiff's obtained right-to-sue notices from the California Department of Fair Housing and Employment (DFEH). (See Exhibits A-D, attached herewith).

Some Federal courts have held a state agency's right-to-sue notice *does not satisfy* Title VII's administrative exhaustion requirement; i.e., a right-to-sue letter from the EEOC is required. *Jones v. Grinnell Corp.* (5th Cir. 2001) 235 F3d 972, 975—"federal-state cooperation does not extend to exhaustion of administrative remedies."

However, other courts have taken the opposite view. In some cases, a right-to-sue letter from the appropriate state agency is as effective as an EEOC letter. The state proceedings serve the purposes of Title VII's administrative exhaustion requirement (notice to employer and opportunity for settlement). *Surrell v. California Water Service Co.*, 518 F3d at 1097, 1105; *Stiefel v. Bechtel Corp.* (9th Cir. 2010) 624 F3d 1240, 1244–1245—because of "worksharing agreement" between Calif. DFEH (state agency) and EEOC, employee was entitled to federal right-to-sue letter after filing timely charge with DFEH.)

The facts in *Surrell* were as follows. "On July 9, 2003, Surrell filed a discrimination charge with the California Department of Fair Employment and Housing (the "State Employment Department"), alleging various discrimination claims against Cal Water. The State Employment

1    Department provided her with a right-to-sue letter and advised her that she could obtain a federal

2    right-to-sue letter from the Equal Employment Opportunity Commission (EEOC). On December

3    9, 2003, Surrell informed Cal Water that she was unable to return to work due to her medical

4    condition. She concluded that she was too emotionally scarred at that time and would not have

5    been able to function. Surrell remained employed but on an unpaid leave of absence during which

6    she received health benefits. On July 6, 2004, Surrell filed suit in California state court against

7    Cal Water and Cox, alleging numerous federal and state employment-discrimination claims based

8    on race, sex, and age. On October 13, 2004, Defendants removed the suit to federal district court.

9    On February 27, 2006, the district court granted summary judgment to Cal Water and Cox on all

10   claims. *Surrell v. Cal. Water Serv. Co.*, No. 04–2143, 2006 WL 464079, 2006 U.S. Dist. LEXIS

11   7326 (E.D.Cal. Feb. 27, 2006). Cal Water and Cox later unsuccessfully moved for fees against

12   Surrell. Surrell brought this appeal of the district court's grant of summary judgment." *Surrell,*

13   *supra* at 1103.

14          In *Surrell,* the Ninth Circuit Court wrote in is Opinion, "Failure to obtain a federal right-

15   to-sue letter does not preclude federal jurisdiction. In *Zipes v. Trans World Airlines, Inc.*, 455

16   U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), the Supreme Court held that,

17   although Title VII requires that plaintiffs timely exhaust administrative remedies, 'a timely charge

18   of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a

19   requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'

20   The Supreme Court explained that Title VII's timeliness provision is entirely separate from Title

21   VII's jurisdictional provisions and 'does not speak in jurisdictional terms or refer in any way to

22   the jurisdiction of the district courts.' *Id.* at 394, 102 S.Ct. 1127. Because Title VII's provisions

23   requiring notice of the right to sue are similarly separate from the jurisdictional provisions, the

24   right-to-sue requirement is similarly non-jurisdictional. See *Temengil v. Trust Territory of Pacific*

25   *Islands*, 881 F.2d 647, 654 (9th Cir.1989) ('Pursuit of administrative remedies is a condition

26   precedent to a Title VII claim. The requirement, however, is not jurisdictional.') (citations

27   omitted); *Karim–Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th

28   Cir.1988) (explaining that "Plaintiff must file a discrimination charge with the Equal Employment

     Opportunity Commission and receive a right-to-sue letter from the Commission," and that, under

1  Zipes, '[f]ailure to observe these requirements renders a suit subject to dismissal *in the absence*

2  *of any equitable consideration to the contrary* ') (emphasis added); *see also Pietras v. Bd. of Fire*

3  *Comm'rs*, 180 F.3d 468, 474 (2d Cir.1999) ('Every circuit before us that has faced the question

4  has held that a plaintiff's failure to obtain a notice-of-right-to-sue letter is not a jurisdictional bar,

5  but only a precondition to bringing a Title VII action that can be waived by the parties or the

6  court.')." *Surrell, supra* at 1104-1105.

7       The Ninth Circuit Court concludes that, " Indeed, courts have reached that conclusion in

8  this precise context where worksharing agreements exist between the federal and state

9  agencies. *See Burke v. Cornerstone.* No. 07–889, 2007 WL 3046193, 1–2, 2007 U.S. Dist. LEXIS

10 76662, at *5–6 (D.Conn. Oct. 12, 2007)('[A]s the purposes of the exhaustion requirement—to

11 provide notice to parties charged with violations and to facilitate voluntary compliance should the

12 investigating agency find merit in the complaint—have been served by the state proceeding, the

13 Court does not view the omission of the actual right-to-sue letter as grounds for dismissal.'); *but*

14 *cf. Jones v. Grinnell Corp.,* 235 F.3d 972, 975 (5th Cir.2001) ("federal-state cooperation does not

15 extend to the exhaustion of administrative remedies"). This is a persuasive approach, which we

16 now adopt. *We hold that where, as here, a plaintiff is entitled to receive a right-to-sue letter from*

17 *the EEOC, a plaintiff may proceed absent such a letter, provided she has received a right-to-sue*

18 *letter from the appropriate state agency. Thus, Surrell's claims may proceed.*" *Surrell, supra* at

19 1105 (emphasis added).

20       The facts in the present case are almost *identical* to the facts in *Surrell*. The Plaintiff in

21 both *Surrell* and the Plaintiffs in the present case obtained right-to-sue letters from the DFEH.

22 Both the Plaintiff in *Surrell* and the Plaintiffs in this case filed suit against *a California water*

23 *agency* in State Court. In both *Surrell* and the present case, Defendant removed the suit to Federal

24 Court. Most importantly, however, is that both *Surrell* and this case were decided in the Ninth

25 Circuit. As such, the Plaintiffs' failure to obtain an EEOC right to sue in the present case *is not*

26 grounds for dismissal of the civil action, since Plaintiff's received right-to-sue notices from the

27 appropriate California State agency, the DFEH. It should also be noted that Hector Martinez

28 received a right-to-sue letter from the EEOC in 2008 for his racial discrimination claim, but

decided against pursuing the case until now.

PLAINTIFF'S OPPOSITION TO                              -7-
DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT
PURSUANT [FRCP 12(b)(6)]

In yet another Ninth Circuit case, *Hause v. The Salvation Army*, the Plaintiff had only filed and received his notice of right-to-sue through the DFEH. *Hause v. Salvation Army*, unreported in F.Supp.2d (Westlaw citation 2007 WL 4219450). In its opinion, the Court found that:

> "To the extent that plaintiff was on notice that his request for a right-to-sue notice from the DFEH did not constitute a request for a right-to-sue notice from the EEOC, this is not pertinent to whether the filing of plaintiff's charge with the DFEH was a constructive filing with the EEOC for the purposes of § 2000e-5(e)(1). Moreover, the Ninth Circuit has observed that for the purposes of determining whether a charge filed with a FEP agency has been constructively filed with the EEOC, it is irrelevant whether the state agency actually forwarded the charge to the EEOC or whether it erroneously began investigating a charge that should have been forwarded to the EEOC. *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1176 (9th Cir.1999). Therefore, even if the DFEH did not forward plaintiff's charge to the EEOC when plaintiff requested and received an immediate right-to-sue notice from the DFEH, plaintiff's complaint to the DFEH would still be deemed a constructive filing with the EEOC by virtue of the constructive filing arrangement between these agencies, which the DFEH-EEOC agreement created.
>
> 29 C.F.R. § 1601.13(b)(2)(ii) does not change this analysis. Nothing in 1601.13(b)(2)(ii), or in any other regulation identified by defendants or the Court, supports defendants' argument that plaintiff's receipt of a DFEH right-to-sue notice prevented his complaint from being constructively filed with the EEOC. There is no indication that this regulation restricts the extent to which worksharing agreements may provide for constructive filing arrangements between the EEOC and applicable state agencies, either when a complainant requests an immediate right-to-sue notice, or in any other situation. Accordingly, the Court finds and concludes that even if 29 C.F.R. § 1601.13(b)(2)(ii) applies in this situation, plaintiff's complaint was filed with the EEOC within the 30-day deadline set forth in this provision because his filing with the DFEH was a constructive filing with the EEOC."

*Surrell, supra* at 6.

Although unreported, this case serves to affirm and reinforce the position of the Courts within the Ninth Circuit as described in *Surrell*. The Plaintiffs in the present case are not barred from civil action despite having only filed for a right-to-sue notice with the California DFEH.

Therefore, Defendant's argument does not comport with the Ninth's Circuit's interpretation of the EEOC right-to-sue requirement for Title VII claims and the Causes of Action should not be dismissed by Defendant's Motion.

**B.      Plaintiff's Failure to Obtain an EEOC Right-to-Sue Notices is No Bar to A Title VII Claim When the Underlying Claim is For Retaliation.**

Defendant asserts that "If Plaintiffs have not sought or obtained their EEOC Right-to Sue notices for conduct alleged in the First Amended Complaint (FAC) already, they cannot do so now." Defendant's statement is un-cited and also, again, contrary to the laws of this jurisdiction.

1   Plaintiff's First Cause of Action and Fourth Cause of Action allege that all Plaintiffs were the

2   victims of Retaliation due to their participation in an investigation into Plaintiff Hector Martinez's

3   claim of Racial Discrimination. A plaintiff whose underlying discrimination claim is barred for

4   failure to exhaust his or her administrative remedy may still prevail on a Title VII claim that he or

5   she was retaliated against for complaining about discrimination. *Place v. Abbott*

6   *Laboratories* (7th Cir. 2000) 215 F3d 803, 806.

7          In the present case, Plaintiffs Hector Martinez, Michael Garrod, George Silva, and Myrna

8   Silva have clearly alleged a credible, articulate and highly detailed set of facts which strongly

9   indicate that Defendant has and continues to retaliate against all Plaintiffs for their participation in

10   the protected activity of assisting in the investigation of the racial discrimination claim made by

11   Plaintiff Hector Martinez against Defendant Sweetwater Authority.

12   **C.      In the Alternative, If the Court Finds that Plaintiffs' Failed to Exhaust Their
            Administrative Remedies Before Filing the First and Fourth Causes of Action,
13          Said Causes of Action Should Be Dismissed Without Prejudice**

14

15          A Title VII suit filed without exhausting administrative remedies is subject to dismissal by

16   the court. But such dismissal should be *without prejudice* to a future action if there is time

17   remaining for plaintiff to file charges. *Lebrón-Ríos v. United States Marshal Serv.* (1st Cir. 2003)

18   341 F3d 7, 12.  The Court in *Lebrón-Ríos* reasoned, "Finally, dismissal without prejudice to a

19   future action on exhausted claims both makes practical sense and comports with the remedial

20   purposes of Title VII. If the EEOC, as the agency charged with administering enforcement of

21   Title VII, would permit plaintiffs' claims to proceed, little purpose is served by denying them the

22   opportunity to have a federal court consider the merits of their asserted right to relief after the

23   EEOC has processed their charges. This policy is particularly important in construing the filing

24   requirements under Title VII, "a statutory scheme in which laymen, [often] unassisted by trained

25   lawyers, initiate the process." *Love v. Pullman Co.,* 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d

26   679 (1972); *see also Isaac v. Harvard Univ.,* 769 F.2d 817, 822, 826 (1st Cir.1985) (endorsing

27   this approach). Surely Congress, in requiring that claims be filed first with the EEOC, did not

28   intend to foreclose all relief for those who mistakenly challenge illegal employment

     discrimination too *early* rather than too late." *Lebrón-Ríos, supra* at 15.

PLAINTIFF'S OPPOSITION TO                              -9-
DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT
PURSUANT [FRCP 12(b)(6)]

1    Clearly, public policy and the legislative intent of the EEOC with regard to Title VII

2    claims is to decide the case on the merits when there is, in fact, a viable claim such as Plaintiffs'.

3    If the Court is not persuaded by Plaintiff's argument that Ninth Circuit precedents establishes that

4    there is work-sharing agreement between the DFEH and EEOC so that a right-to-sue issued by the

5    DFEH constructively functions as a right-to-sue from the EEOC, this Court should still not

6    dismiss these causes with prejudice.

7    As such, Plaintiffs ask that this Court deny Defendant's motion to dismiss the First and

8    Fourth Causes of Action in the FAC. However, if the Court determines that the Defendant has

9    met its burden under FRCP 12(b)(6), Plaintiff asks that the Court dismiss the First and Fourth

10   Causes of Action *without prejudice.*

11                                          II.

12   PLAINTIFFS SECOND AND THIRD CAUSES OF ACTION ARE NEITHER DEFICIENT,

13                              NOR TIME-BARRED

14   **A. Plaintiff's Third Cause of Action is Not Time-Barred Because The Facts Alleged**
     **in the First Amended Complaint Clearly Indicate That Defendant's Racial**
15   **Discrimination Is Continuing To This Day**

16   Defendant incorrectly asserts that Plaintiff Hector Martinez's Racial Discrimination claim

17   is barred by California's Fair Employment and Housing Act (FEHA), which provides that

18   complaints of discrimination must be filed with the Department within one year from the date of

19   the alleged discriminatory act.

20   Defendant has misinterpreted the facts of this case. As alleged in the FAC, Plaintiff Hector

21   Martinez was passed over for a promotion in 2008. The FAC clearly and unmistakably asserts

22   that Mr. Martinez is still being racially discriminated against by Defendant to this very day. The

23   facts alleged in the FAC plainly state that Mr. Martinez still holds the exact same occupation and

24   position within Sweetwater Authority as when he made his racial discrimination claim in 2008.

25   In *Richards v. CH2M Hill, Inc.*, a disabled employee filed suit after obtaining a right-to-

26   sue notice from the DFEH. *Richards v. CH2M Hill, Inc.* 26 Cal.4th 798 (2001). The Defendant in

27   that case argued that the statute of limitations had tolled on the Plaintiff's case because

28   Defendant's initial refusal to accommodate did not begin the tolling of year-long statute of

1   limitation. Rather the California Supreme Court reached the following opinion: "Thus, when an
2   employer engages in a continuing course of unlawful conduct under the FEHA by refusing
3   reasonable accommodation of a disabled employee or engaging in disability harassment, and this
4   course of conduct does not constitute a constructive discharge, the statute of limitations begins to
5   run not necessarily when the employee first believes that his or her rights may have been violated,
6   but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation
7   of such conduct or by the employee's resignation, *or* when the employee is on notice that further
8   efforts to end the unlawful conduct will be in vain. Accordingly, an employer who is confronted
9   with an employee seeking accommodation of disability or relief from disability harassment may
10  assert control over its legal relationship with the employee either by accommodating the
11  employee's requests, or by making clear to the employee in a definitive manner that it will not be
12  granting any such requests, thereby commencing the running of the statute of limitations."

13      The California Supreme Court's opinion should provide guidance as to the intended
14  application of the FEHA. In the present case, Mr. Martinez, much like the Plaintiff in *Richards*,
15  never lost hope that there could be an informal resolution to this case. In a well-intentioned, but
16  admittedly poorly thought-out decision, Mr. Martinez, as recently as May 5, 2013, sent
17  Sweetwater General Manager Jim Smyth a selection of literature called "Defining Racism – Can
18  We Talk?" by Beverly Tatum, a former University of California – Santa Barbara Professor and
19  the current President of Spelman College. The article and e-mail are attached herewith and
20  labeled "Exhibit E." Legally, it may have been unwise for Mr. Martinez to send the e-mail with
21  the aforementioned literature selection. However, it is not only the most powerful and direct
22  insight into Mr. Martinez's subjective belief that he is continuing to be racially discriminated
23  against; it demonstrates that his 2008 discrimination complaint, like in *Richards*, was only the
24  first act in a continuing campaign of racial discrimination against Mr. Martinez. This information,
25  in conjunction with the multiple recent incidents of disparate treatment against Mr. Martinez by
26  Sweetwater Authority as described in the FAC, can be construed as both racial discrimination and
27  retaliation. The two illegal courses of conduct are not mutually exclusive. It is far-fetched and
28  illogical to believe that Defendant Sweetwater committed one act of racial discrimination in 2008
    and then after that it was *only* retaliation – and clearly Mr. Martinez still sees Defendant's conduct

as racially discriminatory and retaliatory. Even if this Court determines that the racial discrimination only occurred in 2008 and all of Plaintiff's allegations thereafter are the products of Defendant's retaliation, Plaintiff would point out that his initial racial discrimination claim is exactly the same today as it was in 2008. He is still not promoted to a position for which he is objectively extremely well-qualified, and has been passed up for individuals who are objectively completely unqualified, if not incompetent.

As such, Defendant's argument that the Plaintiffs' Third Cause of Action is time-barred ignores the reality of the conditions which Plaintiffs were and are subjected to even to this day. Defendant's argument is narrow-sighted in that it views the 2008 racial discrimination claim as compartmentalized event, when in fact, it was the beginning of a campaign of misconduct on the part of the Defendant, that, to this day, is in full force.

**B. Plaintiff's Second Cause of Action For Failure to Prevent Discrimination and Retaliation is Timely And Plead With Sufficient Facts as To Constitute A Claim Upon Which Relief May Be Granted.**

As Stated in the section immediately prior to this, the Failure to Prevent Discrimination and Retaliation Cause of Action absolutely cannot be construed as time-barred, as the FAC clearly indicates that the failures of Defendant as alleged by the Plaintiffs are described as ongoing and continuous. Plaintiffs *have* filed a right-to-sue notice with the DFEH, which Defendant even cites in their Motion. Since Plaintiffs allege that the discrimination and retaliation is happening continuously and to this day, the statute of limitations continues to be one year from the present.

Defendant asserts that "In order for Plaintiffs to properly assert a cause of action for failure to prevent retaliation, they must first allege facts sufficient to constitute retaliation." *See Defendant's Motion to Dismiss*, 11:9, *citing Trujillo v. North County Transit Dist.*(1998) 63 Cal. App. 4th. 280,289. The highly-detailed and extremely specific FAC speaks for itself. Plaintiffs reference *numerous* instances in which they were retaliated and/or discriminated against by Defendant.

In the present case, all four Plaintiffs claim they were retaliated against by the Defendant and the Defendant failed, and continues to fail, to prevent the retaliation and discrimination which

they experience daily. Although Defendant asserts that each of Plaintiffs allegations are somehow deficient, the process of discovery will reveal how utterly pervasive the retaliation was. For the purposes of the FAC and their own credibility, Plaintiffs alleged only those incidents which Plaintiffs believed were objectively retaliatory.

"No pat formula exists for determining with certainty whether the sum of harassing workplace incidents rises to the level of an actionable hostile work environment." *Noviello v. City of Boston*, 398 F.3d 76, 94 (1st Cir. 2005) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (U.S. 1993)). It is for the trier of fact to weigh the totality of the circumstances and assess the matter on a case-by-case basis. *Berry v. Essilor of America, Inc.*, 123 F. Supp. 2d 1342, 1348 (M.D. Fla. 2000); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 898 & n.18 (1st Cir. 1988). The trial court's role is that of a screener to determine whether facts exist that would allow a reasonable jury to reach such a conclusion. *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 24 (1st Cir. 2001). The trial court must resolve all reasonable doubts in favor of the non-moving party in a similar fashion. *Celotex Corp v. Catrett*, 477 U.S. 317 (1986). "In order to establish a prima facie case of retaliation, the plaintiff must show: (1) he [or she] engaged in protected activity; (2) he [or she] suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment action." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1117 (11th Cir. 2001) (citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir.1999); *Little v. United Techns.*, 103 F.3d 956, 959 (11th Cir.1997)); *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998).

In the present case, the totality of the circumstances *strongly* indicates continuing retaliation and discrimination. Logically, it follows that the pervasive culture of retaliation and discrimination is facilitated by the continued failure of Defendant to ameliorate the work conditions alleged by the Plaintiffs in the FAC. A dismissal of the Second Cause of Action, and all of the Causes of Actions for that matter, will unjustly preclude the process of discovery, through which the multitude of incidents documented by the Plaintiffs will, in totality, reveal a truly disturbing image of the discriminatory and retaliatory culture at Sweetwater Authority, as

1  well as the bafflingly prolonged absence of reform and/or remedial action on behalf of the

2  Defendant.

3      Defendant presents its argument against the Plaintiff Second Cause of Action by

4  individually analyzing each instance alone, and criticizes each referenced instance (such as

5  Defendant's denial of an iPhone to Plaintiff Hector Martinez's) as being too flimsy to amount to

6  retaliation. Obviously, when each instance is analyzed strictly on its own, it is impossible, without

7  more, to determine whether the instance is an act of retaliation and/or discrimination. But that is

8  not a realistic view of this case or life in general. That is specifically why the Court in *Berry*

9  articulates that the totality of circumstances determines whether retaliation is occurring, and even

10  then, the facts are construed against the Defendant for the purposes of dismissal, per *Celotex*

11  *Corp.* The court should find, as described in *Rivera-Rodriguez*, that Plaintiffs have alleged more

12  than sufficient facts which could allow a reasonable jury to reach a conclusion that Defendant

13  provided Plaintiffs with a hostile work environment. *Rivera-Rodriguez, supra* at 24.

14      As such, Plaintiffs respectfully request that this Court deny Defendant's Motion to

15  Dismiss the Second Cause of Action of the FAC.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

/ / /

III.

## **CONCLUSION**

In conclusion, Plaintiffs' First Amended Complaint alleges far more than enough facts to support Plaintiff's Causes of Actions. That is to say, it is extremely unlikely that Plaintiff Hector Martinez, as well as Plaintiffs Michael Garrod, George Silva and Myrna Silva, who happened to be the only three co-workers who supported his initial racial discrimination claim against Defendant Sweetwater Authority, are *all* coincidentally befallen with highly unfavorable developments at their work and in their careers. Each one of the Plaintiffs is a highly-educated, responsible, and hard-working individual who, as the FAC clearly and fully alleges, have been unfairly subjected to all types of disturbingly willful and malicious conduct by their employer, Defendant Sweetwater Authority.

Therefore, in the interest of manifest and long-overdue justice, Plaintiffs respectfully request that this Court deny Defendant's Motion to Dismiss each and all of Plaintiffs' four Causes of Action, as embodied in the First Amended Complaint.

Respectfully Submitted,

THE LAW OFFICES OF ELLIOTT KANTER

DATED: 5-30-13

_____
ELLIOTT KANTER, ESQ.
Attorney for Plaintiffs,
HECTOR MARTINEZ, MICHAEL GARROD
GEORGE SILVA and MYRNA SILVA

# EXHIBIT
# A



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                    GOVERNOR EDMUND G. BROWN JR.

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Dec 05, 2012

Hector Martinez

1066 Florido Plaza

Chula Vista, CA 91910

RE: 48657-23270  - Martinez Hector - Right To Sue

### Notice of Case Closure and Right to Sue

Dear Hector Martinez:

This letter informs you that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective Dec 05, 2012 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

Department of Fair Employment and Housing

cc: James Smyth, Agent for Service for Sweetwater Authority

# EXHIBIT
# B



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                    GOVERNOR EDMUND G. BROWN JR.

DEPARTMENT OF FAIR EMPLOYMENT & HOUSING                    DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Dec 05, 2012

George Silva

14275 Hillside Dr.

Jamul, CA 91935

RE: 68060-32104  - Silva George - Right To Sue

Notice of Case Closure and Right to Sue

Dear George Silva:

This letter informs you that the above-referenced complaint that was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective Dec
05, 2012 because an immediate Right to Sue notice was requested. DFEH will take no
further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the
case is still open at the end of the three-year period.

Sincerely,

Department of Fair Employment and Housing

cc: James Smyth, Agent for Service for Sweetwater Authority

# EXHIBIT
# C



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                    GOVERNOR EDMUND G. BROWN JR.

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING                    DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Dec 05, 2012


Michael Garrod

5604 Loping Lane

Bonita, CA 91902


RE: 68083-32109  - Garrod Michael - Right To Sue

Notice of Case Closure and Right to Sue


Dear Michael Garrod:

This letter informs you that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective Dec 05, 2012 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,



Department of Fair Employment and Housing



cc: James Smyth, Agent for Service for Sweetwater Authority

# EXHIBIT
# D



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                    GOVERNOR EDMUND G. BROWN JR.

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING                    DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684  | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Dec 05, 2012


Myrna Silva

14275 Hillside Dr.

Jamul, CA 91935


RE: 68071-32106  - Silva Myrna - Right To Sue

Notice of Case Closure and Right to Sue


Dear Myrna Silva:

This letter informs you that the above-referenced complaint that was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective Dec
05, 2012 because an immediate Right to Sue notice was requested. DFEH will take no
further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the
case is still open at the end of the three-year period.

Sincerely,



Department of Fair Employment and Housing


cc: James Smyth, Agent for Service for Sweetwater Authority

# EXHIBIT

# E



## Fwd: racism reading

From: **Hector Martinez** <martinez743@gmail.com>
Date: Sun, May 5, 2013 at 8:11 PM
Subject: Fwd: racism reading
To: Jim Smyth <smyth1@cox.net>


You may find this reading interesting...


--
Hector



--
Hector

DefiningRacism.CanWeTalk.Tatum.pdf
441K

# 1

# Defining Racism
## "Can we talk?"

Early in my teaching career, a White student I knew asked me what I would be teaching the following semester. I mentioned that I would be teaching a course on racism. She replied, with some surprise in her voice, "Oh, is there still racism?" I assured her that indeed there was and suggested that she sign up for my course. Fifteen years later, after exhaustive media coverage of events such as the Rodney King beating, the Charles Stuart and Susan Smith cases, the O. J. Simpson trial, the appeal to racial prejudices in electoral politics, and the bitter debates about affirmative action and welfare reform, it seems hard to imagine that anyone would still be unaware of the reality of racism in our society. But in fact, in almost every audience I address, there is someone who will suggest that racism is a thing of the past. There is always someone who hasn't noticed the stereotypical images of people of color in the media, who hasn't observed the housing discrimination in their community, who hasn't read the newspaper articles about documented racial bias in lending practices among well-known banks, who isn't aware of the racial tracking pattern at the local school, who hasn't seen the reports of rising incidents of racially motivated hate crimes in America—in short, someone who hasn't been paying attention to issues of race. But if you are paying attention, the legacy of racism is not hard to see, and we are all affected by it.

The impact of racism begins early. Even in our preschool years, we are exposed to misinformation about people different from ourselves. Many of us grew up in neighborhoods where we had limited opportunities to interact with people different from our own families.

3

Case 3:13-cv-00167-CAB-NLS   Document 13   Filed 05/30/13   PageID.146   Page 27 of 34

When I ask my college students, "How many of you grew up in neighborhoods where most of the people were from the same racial group as your own?" almost every hand goes up. There is still a great deal of social segregation in our communities. Consequently, most of the early information we receive about "others"—people racially, religiously, or socioeconomically different from ourselves—does not come as the result of firsthand experience. The secondhand information we do receive has often been distorted, shaped by cultural stereotypes, and left incomplete.

Some examples will highlight this process. Several years ago one of my students conducted a research project investigating preschoolers' conceptions of Native Americans. Using children at a local day care center as her participants, she asked these three- and four-year-olds to draw a picture of a Native American. Most children were stumped by her request. They didn't know what a Native American was. But when she rephrased the question and asked them to draw a picture of an Indian, they readily complied. Almost every picture included one central feature. In fact, many of them also included a weapon—a knife or tomahawk—and depicted the person in violent or aggressive terms. Though this group of children, almost all of whom were White, did not live near a large Native American population and probably had had little if any personal interaction with American Indians, they all had internalized an image of what Indians were like. How did they know? Cartoon images, in particular the Disney movie Peter Pan, were cited by the children as their number-one source of information. At the age of three, these children already had a set of stereotypes in place. Though I would not describe three-year-olds as prejudiced, the stereotypes to which they have been exposed become the foundation for the adult prejudices so many of us have.

Sometimes the assumptions we make about others come not from what we have been told or what we have seen on television or in books, but rather from what we have not been told. The distortion of historical information about people of color leads young people

(and older people, too) to make assumptions that may go unchallenged for a long time. Consider this conversation between two White students following a discussion about the cultural transmission of racism:

"Yeah, I just found out that Cleopatra was actually a Black woman."

"What?"

The first student went on to explain her newly learned information. The second student exclaimed in disbelief, "That can't be true. Cleopatra was beautiful!"

What had this young woman learned about who in our society is considered beautiful and who is not? Had she conjured up images of Elizabeth Taylor when she thought of Cleopatra? The new information her classmate had shared and her own deeply ingrained assumptions about who is beautiful and who is not were too incongruous to allow her to assimilate the information at that moment.

Omitted information can have similar effects. For example, another young woman, preparing to be a high school English teacher, expressed her dismay that she had never learned about any Black authors in any of her English courses. How was she to teach about them to her future students when she hadn't learned about them herself? A White male student in the class responded to this discussion with frustration in his response journal, writing "It's not my fault that Blacks don't write books." Had one of his elementary, high school, or college teachers ever told him that there were no Black writers? Probably not. Yet because he had never been exposed to Black authors, he had drawn his own conclusion that there were none.

Stereotypes, omissions, and distortions all contribute to the development of prejudice. Prejudice is a preconceived judgment or opinion, usually based on limited information. I assume that we all have prejudices, not because we want them, but simply because we are so continually exposed to misinformation about others. Though I have often heard students or workshop participants describe someone as not having "a prejudiced bone in his body," I usually suggest that they

look again. Prejudice is one of the inescapable consequences of living in a racist society. Cultural racism—the cultural images and messages that affirm the assumed superiority of Whites and the assumed inferiority of people of color—is like smog in the air. Sometimes it is so thick it is visible, other times it is less apparent, but always, day in and day out, we are breathing it in. None of us would introduce ourselves as "smog-breathers" (and most of us don't want to be described as prejudiced), but if we live in a smoggy place, how can we avoid breathing the air? If we live in an environment in which we are bombarded with stereotypical images in the media, are frequently exposed to the ethnic jokes of friends and family members, and are rarely informed of the accomplishments of oppressed groups, we will develop the negative categorizations of those groups that form the basis of prejudice.

People of color as well as Whites develop these categorizations. Even a member of the stereotyped group may internalize the stereotypical categories about his or her own group to some degree. In fact, this process happens so frequently that it has a name, *internalized oppression*. Some of the consequences of believing the distorted messages about one's own group will be discussed in subsequent chapters.

Certainly some people are more prejudiced than others, actively embracing and perpetuating negative and hateful images of those who are different from themselves. When we claim to be free of prejudice, perhaps what we are really saying is that we are not hatemongers. But none of us is completely innocent. Prejudice is an integral part of our socialization, and it is not our fault, just as the preschoolers my student interviewed are not to blame for the negative messages they internalized, we are not at fault for the stereotypes, distortions, and omissions that shaped our thinking as we grew up.

To say that it is not our fault does not relieve us of responsibility, however. We may not have polluted the air, but we need to take responsibility, along with others, for cleaning it up. Each of us needs to look at our own behavior. Am I perpetuating and reinforcing the negative messages so pervasive in our culture, or am I seeking to chal-

lenge them? If I have not been exposed to positive images of marginalized groups, am I seeking them out, expanding my own knowledge base for myself and my children? Am I acknowledging and examining my own prejudices, my own rigid categorizations of others, thereby minimizing the adverse impact they might have on my interactions with those I have categorized? Unless we engage in these and other conscious acts of reflection and reeducation, we easily repeat the process with our children. We teach what we were taught. The unexamined prejudices of the parents are passed on to the children. It is not our fault, but it is our responsibility to interrupt this cycle.

## Racism: A System of Advantage Based on Race

Many people use the terms *prejudice* and *racism* interchangeably. I do not, and I think it is important to make a distinction. In his book *Portraits of White Racism*, David Wellman argues convincingly that limiting our understanding of racism to prejudice does not offer a sufficient explanation for the persistence of racism. He defines racism as a "system of advantage based on race." In illustrating this definition, he provides example after example of how Whites defend their racial advantage—access to better schools, housing, jobs—even when they do not embrace overtly prejudicial thinking. Racism cannot be fully explained as an expression of prejudice alone.

This definition of racism is useful because it allows us to see that racism, like other forms of oppression, is not only a personal ideology based on racial prejudice, but a system involving cultural messages and institutional policies and practices as well as the beliefs and actions of individuals. In the context of the United States, this system clearly operates to the advantage of Whites and to the disadvantage of people of color. Another related definition of racism, commonly used by antiracist educators and consultants, is "prejudice plus power." Racial prejudice when combined with social power—access to social, cultural, and economic resources and decision-making—leads to the

institutionalization of racist policies and practices. While I think this definition also captures the idea that racism is more than individual beliefs and attitudes, I prefer Wellman's definition because the idea of systematic advantage and disadvantage is critical to an understanding of how racism operates in American society.

In addition, I find that many of my White students and workshop participants do not feel powerful. Defining racism as prejudice plus power has little personal relevance. For some, their response to this definition is the following: "I'm not really prejudiced, and I have no power, so racism has nothing to do with me." However, most White people, if they are really being honest with themselves, can see that there are advantages to being White in the United States. Despite the current rhetoric about affirmative action and "reverse racism," every social indicator, from salary to life expectancy, reveals the advantages of being White.³

The systematic advantages of being White are often referred to as White privilege. In a now well-known article, "White Privilege: Unpacking the Invisible Knapsack," Peggy McIntosh, a White feminist scholar, identified a long list of societal privileges that she received simply because she was White.⁴ She did not ask for them, and it is important to note that she hadn't always noticed that she was receiving them. They included major and minor advantages. Of course she enjoyed greater access to jobs and housing. But she also was able to shop in department stores without being followed by suspicious salespeople and could always find appropriate hair care products and makeup in any drugstore. She could send her child to school confident that the teacher would not discriminate against him on the basis of race. She could also be late for meetings, and talk with her mouth full, fairly confident that these behaviors would not be attributed to the fact that she was White. She could express an opinion in a meeting or in print and not have it labeled the "White" viewpoint. In other words, she was more often than not viewed as an individual, rather than as a member of a racial group.

This article rings true for most White readers, many of whom may have never considered the benefits of being White. It's one thing to have enough awareness of racism to describe the ways that people of color are disadvantaged by it. But this new understanding of racism is more elusive. In very concrete terms, it means that if a person of color is the victim of housing discrimination, the apartment that would otherwise have been rented to that person of color is still available for a White person. The White tenant is, knowingly or unknowingly, the beneficiary of racism, a system of advantage based on race. The unsuspecting tenant is not to blame for the prior discrimination, but she benefits from it anyway.

For many Whites, this new awareness of the benefits of a racist system elicits considerable pain, often accompanied by feelings of anger and guilt. These uncomfortable emotions can hinder further discussion. We all like to think that we deserve the good things we have received, and that others, too, get what they deserve. Social psychologists call this tendency a "belief in a just world."⁵ Racism directly contradicts such notions of justice.

Understanding racism as a system of advantage based on race is antithetical to traditional notions of an American meritocracy. For those who have internalized this myth, this definition generates considerable discomfort. It is more comfortable simply to think of racism as a particular form of prejudice. Notions of power or privilege do not have to be addressed when our understanding of racism is constructed in that way.

The discomfort generated when a systemic definition of racism is introduced is usually quite visible in the workshops I lead. Someone in the group is usually quick to point out that this is not the definition you will find in most dictionaries. I reply, "Who wrote the dictionary?" I am not being facetious with this response. Whose interests are served by a "prejudice only" definition of racism? It is important to understand that the system of advantage is perpetuated when we do not acknowledge its existence.

## Racism: For Whites Only?

Frequently someone will say, "You keep talking about White people. People of color can be racist, too." I once asked a White teacher what it would mean to her if a student or parent of color accused her of being racist. She said she would feel as though she had been punched in the stomach or called a "low-life scum." She is not alone in this feeling. The word *racist* holds a lot of emotional power. For many White people, to be called racist is the ultimate insult. The idea that this term might only be applied to Whites becomes highly problematic for after all, can't people of color be "low-life scum" too?

Of course, people of any racial group can hold hateful attitudes and behave in racially discriminatory and bigoted ways. We can all cite examples of horrible hate crimes which have been perpetrated by people of color as well as Whites. Hateful behavior is hateful behavior no matter who does it. But when I am asked, "Can people of color be racist?" I reply, "The answer depends on your definition of racism." If one defines racism as racial prejudice, the answer is yes. People of color can and do have racial prejudices. However, if one defines racism as a system of advantage based on race, the answer is no. People of color are not racist because they do not systematically benefit from racism. And equally important, there is no systematic cultural and institutional support or sanction for the racial bigotry of people of color. In my view, reserving the term *racist* only for behaviors committed by Whites in the context of a White-dominated society is a way of acknowledging the ever-present power differential afforded Whites by the culture and institutions that make up the system of advantage and continue to reinforce notions of White superiority. (Using the same logic, I reserve the word *sexist* for men. Though women can and do have gender-based prejudices, only men systematically benefit from sexism.)

Despite my best efforts to explain my thinking on this point, there are some who will be troubled, perhaps even incensed, by my response. To call the racially motivated acts of a person of color acts

of racial bigotry and to describe similar acts committed by Whites as racist will make no sense to some people, including some people of color. To those, I will respectfully say, "We can agree to disagree." At moments like these, it is not agreement that is essential, but clarity. Even if you don't like the definition of racism I am using, hopefully you are now clear about what it is. If I also understand how you are using the term, our conversation can continue—despite our disagreement.

Another provocative question I'm often asked is "Are you saying all Whites are racist?" When asked this question, I again remember that White teacher's response, and I am conscious that perhaps the question I am really being asked is, "Are you saying all Whites are bad people?" The answer to that question is of course not. However, all White people, intentionally or unintentionally, do benefit from racism. A more relevant question is what are White people as individuals doing to interrupt racism? For many White people, the image of a racist is a hood-wearing Klan member or a name-calling Archie Bunker figure. These images represent what might be called *active racism*, blatant, intentional acts of racial bigotry and discrimination. *Passive racism* is more subtle and can be seen in the collusion of laughing when a racist joke is told, of letting exclusionary hiring practices go unchallenged, of accepting as appropriate the omissions of people of color from the curriculum, and of avoiding difficult race-related issues. Because racism is so ingrained in the fabric of American institutions, it is easily self-perpetuating. All that is required to maintain it is business as usual.

I sometimes visualize the ongoing cycle of racism as a moving walkway at the airport. Active racist behavior is equivalent to walking fast on the conveyor belt. The person engaged in active racist behavior has identified with the ideology of White supremacy and is moving with it. Passive racist behavior is equivalent to standing still on the walkway. No overt effort is being made, but the conveyor belt moves the bystanders along to the same destination as those who are actively walking. Some of the bystanders may feel the motion of the

conveyor belt, see the active racists ahead of them, and choose to turn around, unwilling to go to the same destination as the White supremacists. But unless they are walking actively in the opposite direction at a speed faster than the conveyor belt—unless they are actively antiracist—they will find themselves carried along with the others.

So, not all Whites are actively racist. Many are passively racist. Some, though not enough, are actively antiracist. The relevant question is not whether all Whites are racist, but how we can move more White people from a position of active or passive racism to one of active antiracism? The task of interrupting racism is obviously not the task of Whites alone. But the fact of White privilege means that Whites have greater access to the societal institutions in need of transformation. To whom much is given, much is required.

It is important to acknowledge that while all Whites benefit from racism, they do not all benefit equally. Other factors, such as socioeconomic status, gender, age, religious affiliation, sexual orientation, mental and physical ability, also play a role in our access to social influence and power. A White woman on welfare is not privileged to the same extent as a wealthy White heterosexual man. In her case, the systematic disadvantages of sexism and classism intersect with her White privilege, but the privilege is still there. This point was brought home to me in a 1994 study conducted by a Mount Holyoke graduate student, Phyllis Wentworth.[7] Wentworth interviewed a group of female college students, who were both older than their peers and were the first members of their families to attend college, about the pathways that lead them to college. All of the women interviewed were White, from working-class backgrounds, from families where women were expected to graduate from high school and get married or get a job. Several had experienced abusive relationships and other personal difficulties prior to coming to college. Yet their experiences were punctuated by "good luck" stories of apartments obtained without a deposit, good jobs offered without experience or extensive reference checks, and encouragement provided by willing mentors.

While the women acknowledged their good fortune, none of them discussed their Whiteness. They had not considered the possibility that being White had worked in their favor and helped give them the benefit of the doubt at critical junctures. This study clearly showed that even under difficult circumstances, White privilege was still operating.

It is also true that not all people of color are equally targeted by racism. We all have multiple identities that shape our experience. I can describe myself as a light-skinned, well-educated, heterosexual, able-bodied, Christian African American woman raised in a middle-class suburb. As an African American woman, I am systematically disadvantaged by race and by gender, but I systematically receive benefits in the other categories, which then mediate my experience of racism and sexism. When one is targeted by multiple isms—racism, sexism, classism, heterosexism, ableism, anti-Semitism, ageism—in whatever combination, the effect is intensified. The particular combination of racism and classism in many communities of color is life-threatening. Nonetheless, when I, the middle-class Black mother of two sons, read another story about a Black man's unlucky encounter with a White police officer's deadly force, I am reminded that racism by itself can kill.

## The Cost of Racism

Several years ago, a White male student in my psychology of racism course wrote in his journal at the end of the semester that he had learned a lot about racism and now understood in a way he never had before just how advantaged he was. He also commented that he didn't think he would do anything to try to change the situation. After all, the system was working in his favor. Fortunately, his response was not typical. Most of my students leave my course with the desire (and an action plan) to interrupt the cycle of racism. However, this young man's response does raise an important question. Why should Whites who are advantaged by racism want to end that system of advantage? What are the costs of that system to them?

14 A Definition of Terms

A *Money* magazine article called "Race and Money" chronicled the many ways the American economy was hindered by institutional racism.⁸ Whether one looks at productivity lowered by racial tensions in the workplace, or real estate equity lost through housing discrimination, or the tax revenue lost in underemployed communities of color, or the high cost of warehousing human talent in prison, the economic costs of racism are real and measurable.

As a psychologist, I often hear about the less easily measured costs. When I ask White men and women how racism hurts them, they frequently talk about their fears of people of color, the social incompetence they feel in racially mixed situations, the alienation they have experienced between parents and children when a child marries into a family of color, and the interracial friendships they had as children that were lost in adolescence or young adulthood without their ever understanding why. White people are paying a significant price for the system of advantage. The cost is not as high for Whites as it is for people of color, but a price is being paid.⁹ Wendell Berry, a White writer raised in Kentucky, captures this psychic pain in the opening pages of his book, *The Hidden Wound*:

If white people have suffered less obviously from racism than black people, they have nevertheless suffered greatly; the cost has been greater perhaps than we can yet know. If the white man has inflicted the wound of racism upon black men, the cost has been that he would receive the mirror image of that wound into himself. As the master, or as a member of the dominant race, he has felt little compulsion to acknowledge it or speak of it; the more painful it has grown the more deeply he has hidden it within himself. But the wound is there, and it is a profound disorder, as great a damage in his mind as it is in his society.¹⁰

The dismantling of racism is in the best interests of everyone.

## A Word About Language

Throughout this chapter I have used the term *White* to refer to Americans of European descent. In another era, I might have used the term *Caucasian*. I have used the term *people of color* to refer to those groups in America that are and have been historically targeted by racism. This includes people of African descent, people of Asian descent, people of Latin American descent, and indigenous peoples (sometimes referred to as Native Americans or American Indians).¹¹ Many people refer to these groups collectively as non-Whites. This term is particularly offensive because it defines groups of people in terms of what they are not. (Do we call women "non-men?") I also avoid using the term *minorities* because it represents another kind of distortion of information which we need to correct. So-called minorities represent the majority of the world's population. While the term *people of color* is inclusive, it is not perfect. As a workshop participant once said, White people have color, too. Perhaps it would be more accurate to say "people of more color," though I am not ready to make that change. Perhaps fellow psychologist Linda James Myers is on the right track. She refers to two groups of people, those of acknowledged African descent and those of unacknowledged African descent, reminding us that we can all trace the roots of our common humanity to Africa.

I refer to people of acknowledged African descent as Black. I know that *African American* is also a commonly used term, and I often refer to myself and other Black people born and raised in America in that way. Perhaps because I am a child of the 1960s "Black and beautiful" era, I still prefer *Black*. The term is more inclusive than *African American*, because there are Black people in the United States who are not African American—Afro-Caribbeans, for example—yet are targeted by racism, and are identified as Black.

When referring to other groups of color, I try to use the terms that the people themselves want to be called. In some cases, there is no clear consensus. For example, some people of Latin American

Defining Racism 15

ancestry prefer *Latino*, while others prefer *Hispanic* or, if of Mexican descent, *Chicano*.[11] The terms *Latino* and *Hispanic* are used interchangeably here. Similarly, there are regional variations in the use of the terms *Native American*, *American Indian*, and *Indian*. *American Indian* and *Native people* are now more widely used than *Native American*, and the language used here reflects that. People of Asian descent include Pacific Islanders, and that is reflected in the terms *Asian/Pacific Islanders* and *Asian Pacific Americans*. However, when quoting others I use whichever terms they use.

My dilemma about the language to use reflects the fact that race is a social construction.[12] Despite myths to the contrary, biologists tell us that the only meaningful racial categorization is that of human. Van den Berghe defines race as "a group that is socially defined but on the basis of physical criteria," including skin color and facial features.[13]

*Racial identity development*, a central focus of this book, usually refers to the process of defining for oneself the personal significance and social meaning of belonging to a particular racial group. The terms *racial identity* and *ethnic identity* are often used synonymously, though a distinction can be made between the two. An ethnic group is a socially defined group based on cultural criteria, such as language, customs, and shared history. An individual might identify as a member of an ethnic group (Irish or Italian, for example) but might not think of himself in racial terms (as White). On the other hand, one may recognize the personal significance of racial group membership (identifying as Black, for instance) but may not consider ethnic identity (such as West Indian) as particularly meaningful.

Both racial and ethnic categories are socially constructed, and social definitions of these categories have changed over time. For example, in his book *Ethnic Identity: The Transformation of White America*, Richard Alba points out that the high rates of intermarriage and the dissolution of other social boundaries among European ethnic groups in the United States have reduced the significance of ethnic identity for these groups. In their place, he argues, a new ethnic identity is emerging, that of European American.[14]

Throughout this book, I refer primarily to racial identity. It is important, however, to acknowledge that ethnic identity and racial identity sometimes intersect. For example, dark-skinned Puerto Ricans may identify culturally as Puerto Rican and yet be categorized racially by others as Black on the basis of physical appearance. In the case of either racial or ethnic identity, these identities remain most salient to individuals of racial or ethnic groups that have been historically disadvantaged or marginalized.

The language we use to categorize one another racially is imperfect. These categories are still evolving as the current debate over Census classifications indicates.[15] The original creation of racial categories was in the service of oppression. Some may argue that to continue to use them is to continue that oppression. I respect that argument. Yet it is difficult to talk about what is essentially a flawed and problematic social construct without using language that is itself problematic. We have to be able to talk about it in order to change it. So this is the language I choose.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR MARTINEZ, GEORGE SILVA, MICHAEL GARROD, AND MYRNA SILVA,<br><br>                    Plaintiffs,<br><br>v.<br><br>SWEETWATER AUTHORITY and DOES 1 THROUGH 50, INCLUSIVE,<br><br>                    Defendant. | CASE NO.: 3:13-cv-00167-CAB-NLS<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, Sam Zakhour, am a citizen of the United States and am at least eighteen years of age. My business address is 2445 Fifth Avenue, Suite 350, San Diego, California 92101.

I am not a party to the above-entitled action. I have caused service of the PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENED COMPLAINT PURSUANT F.R.C.P. 12(b)(6)  and this CERTIFICATE OF SERVICE on the following parties by electronically filing the foregoing with the Clerk of the U.S. District Court for the Southern District of California using its ECF System, which electronically notifies them and via email:

Golnar Jabbari Fozi, Esq.        (e-mail: gfozi@meyersfozi.com)

Jeremy Dwork, Esq.             (e-mail: jdwork@meyersfozi.com)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 30, 2013

Sam Zakhour